This is Keck v. Carder, number 518-0460. Counsel ready. May it please the court, the court and counsel. My name is Larry Mullen, and I'm here representing the Carders in this case, the original defendants. And this case is here after the trial court granted summary judgment in favor of the plaintiffs. This is an adverse possession case, and so we have summary judgment where the pleadings, exhibits, depositions are to be construed in the likeness favorable to my clients, in this case the non-movements. And so we look at that in the context of adverse possession and look at the factors that exist in adverse possession. And the primary factor here that we focused on is the boundary. And under the authorities that the plaintiffs have to prove by clearly convincing evidence a definite and ascertainable boundary with precision. There is a system of real estate descriptions, sections, quarter sections, quarter quarter sections, and those are all laid out. And surveyors can go out and find these locations. And in this particular case, there are two surveys in the record, one by Sean Taylor and one by Rodney Smith. And both of these surveys show the survey boundaries of the reported deeds. And so then we have, in Sean Taylor's survey, there is an area that has been designated disputed access and disputed land. And so the huge question in a case like this is how are we going to define the boundary? Are we going to say, well, it's approximately here, this lane, dirt, grassy, whatever it is, approximately started in the middle of a group of trees. And then it was 20 feet wide pursuant to direction of one plaintiff. But in this case, you have a surveyor locating the center line of that road with precision, don't you? The center line of that road, you're talking about the grassy lane. Yes. I don't think that the surveyor testified that he located the entire center line. He found spots where it appeared the dirt was present. And so there was never any exact location of the center line. In fact, the surveyor testified that when he was asked was this 20 feet wide, this roadway was 20 feet wide, which is what he had been told to make it, he said no, it was somewhere between 12 to 15 feet wide. So we don't even know where the edges of it are at. And so even if he were to locate one spot that he thinks may have been originally used, that doesn't define by clear convincing evidence a definite and ascertainable boundary. And so when we have that kind of a situation, we have no way of knowing how wide it's supposed to be, this lane. And if the lane is supposed to be the boundary, then of the disputed ground, if the lane is 20 feet wide, then the western boundary is going to be moved over some distance compared to if the lane is 12 feet wide. So you have no possible way of knowing where that is at. So when you compare that with the survey lines of the court of deeds, then we know exactly where that is. So the danger that you have in cases where we're trying to, when a plaintiff or a party is trying to say that a boundary has been changed because of adverse possession, it's dangerous because what you're going to end up with over time is an area throughout the state where fields can't be identified. Quarter sections can't be identified with any certainty because you're going to have angled lines, you're going to have curved lines, you're going to have zigzag lines. If you said, well, there's a ditch that is the boundary, well, how do you know where that's at over a period of time? Now, the surveyor, Sean Taylor, in his deposition testimony, he was asked about photographs, aerial photographs, and stated that those couldn't be relied upon to go back beyond the year 2005, I believe it was. And even then, even then, he says, we can look at crop lines where one farm plants corn and the other plants beans and where they come together. So we can tell that within 20 feet. Well, 20 feet is a pretty good size boundary. So I don't know the dimensions of this room, for example, but 20 feet is a pretty good area. And so what we are talking about is taking an imaginary line, which would be the survey boundaries of recorded properties, and trying to change that with unknowns. So it would be different, for example, in some cases had you, if you had a fence that existed for a long period of time that had not been altered, if you had perhaps even something like a sidewalk in some areas that had been there for a long period of time, and the parties on either side of the sidewalk recognize that sidewalk as the dividing line. But we don't have any of that here. And again, we're here on the summary judgment issue. So we submit that there have been enough facts shown to be in dispute regarding this so-called boundary that plaintiffs advanced to defeat the granting of a summary judgment. What would you point to in the depositions and affidavits that you filed that would create the material issue of fact? The deposition of Sean Taylor, one of the surveyors, testified again about the air photographs and their potential use, and that they were used to create this lane, I guess you would call it, or this dispute of access. But in his testimony, he said, well, you can't rely on those if they're beyond 2005. So that doesn't get you past 20 years. And he also indicated that as far as the crop lines go, you can't tell those within 20 feet. The only way to tell those is to be physically there in the field with a GPS unit to get the coordinates where the crops come together. So in light of his testimony, you have disputed issues and material facts about where this is supposed to be. So I don't see that based upon the deposition testimony of Sean Taylor alone, I think you have disputed issues of fact. The affidavits of Darrell and Shane Carter, who farm this property, indicated that the area, if you want to call it that, the disputed area, had shifted from one time the farmer would be over this way a few feet, another time over this way. In fact, in the deposition testimony of Myron Widener, who is Mr. Peck's tenant farmer, he testified that on one occasion that we know of, his son actually planted into the area that they believe was the disputed access. And so you, you know, is that just ignoring it? Do we not know where it is? His answer basically was that, well, have you ever driven a tractor? And I said no, but basically you have wide equipment that swings around. So, you know, we're seeing more and more of these cases. Better old adage that good fences make good neighbors. You may hold some truth to it, and I think that the wisdom behind the legal authority that someone who's trying to change an established boundary, established being the survey lines of recorded properties, has to show by clear and convincing evidence a definite and ascertainable boundary. And there is wisdom behind that, because otherwise you're going to run into those kind of problems. And I don't know what drives these cases, whether it's the value of ground or what it is, but we do see more and more of them as farmers have removed fences to allow for larger equipment to turn and not have to run into fences and things of that nature. So we're asking this court to reverse the trial courts granting the summary judgment. We believe that there are clearly disputes of material fact. And at the end of the day, there is one clearly ascertainable boundary for these properties, and that's the boundary that both Sean Taylor and Rodney Smith found in their surveys, which would be the survey of the recorded deeded property. Thank you. Thank you, counsel. Thank you. Okay, please, the court. Counsel. This is a bit of a unique case. Counsel, can you identify yourself? Oh, I'm sorry. I'm Aaron Jones, counsel for the Kecks. And basically, this is a little bit of a unique case of adverse possession. Most of them I've been involved in, including many that have been cited by both parties, are cases where we're talking about a little sliver of ground along what the legally described boundary is. This is different because we're talking about an almost three-and-a-half-acre section that was farmed for nearly or a little more than 70 years by my clients and their family, their predecessors in interest. The way that that was farmed was dependent upon what we've called the disputed access in our filings. And as counsel indicated, there was a survey by Sean Taylor that identified the legal description for that. Yes, he did indicate in his testimony that he was able to find the center line when he went out there and did his physical inspection of the property, did his field work, in other words, for that. He also did use the photographs that he was able to find to try to verify that that was, in fact, the location of it. The thing that I think is also important about what he said, he did indicate that if he was only using these aerial photographs, he could not get necessarily a precise location for a crop line because it could, you know, be subject to a little bit of variance, maybe as much as 20 feet. The difference here is that we actually have testimony of witnesses supporting the location of that crop line prior to that. This is not a case where we're relying only on photographic evidence that this surveyor looked at. We're combining testimony of my own writer, the tenant farmer from my client, of my client, Mr. James Keck, to say this is the location of the crop line. It was the edge of the road, the disputed access, as we're calling it, for 70-plus years, until the survey was done by the Carters a few years back. They realized, hey, they've been farming three-and-a-half acres of our ground, as legally described, and they farmed and bisqued over the disputed access and the road. Well, counsel, even though summary judgment was granted, and that's what's on appeal, aren't there several issues still pending for trial? The issue still pending is one of damages. We allege that because summary judgment was properly granted and we should get adverse possession, once they came over on the three-and-a-half acres and started farming it, there are damage issues that go with that. We have been stopped from gaining access and farming the three-and-a-half acres and utilizing the disputed access also for a few years now, and so there are damage issues yet to be resolved in the trial court, correct? We do believe the trial court got this issue right on summary judgment. The issue regarding the affidavits of the two Carters, I find it very interesting as to what they don't say in those affidavits. They suggest that there's been some variance in farming, but nowhere in there do they say that the disputed access ever moved, that this dirt lane or grass road ever moved any. They don't dispute anything about that from those affidavits. It's very vague as to what they say at all in those affidavits. It appears that what they're trying to do is create a genuine issue of material fact for the sole purpose of avoiding a potential summary judgment, and it appears that they're also pretty vague on the dates of when these things that they do allege supposedly happened. They say that Mr. Carter, that would be Daryl Carter, has been farming along with his son for a combined 34 years. As I said before, my clients and their predecessors, their family, goes back more than 70 years here. We're talking about a much longer period of time that we're going back here. Mr. Myron Widener may have farmed into the disputed access for one year, but he didn't begin farming that until 1990. That is 40-plus, almost 50 years after my clients had begun farming to this point, including this three-and-a-half acres. Well, in the affidavit, the son, Mr. Daryl Carter, there is a sentence that says, Over the years, the area recognized by the parties as a boundary line has shifted from time to time, and the precise area to which each party has farmed has not been consistent. Now, doesn't that create an issue of credibility? I don't believe it does. I believe that Mr. Carter could have submitted more information in his affidavit to be specific about what he's talking about, including whether or not there was any variance in the location of the disputed access. He did not take a deposition, and that hasn't been submitted. All we have is this affidavit, which just has a few bits of information in it. And I don't believe that what he's put in there alone is enough to establish any sort of credibility issue as to what my clients have said. Again, we not only have the testimony of Myron Widener and James Keck, we have aerial photographs from a number of years that support what they're saying, too. It doesn't seem to support from what the testimony has been. Other than these affidavits, the objective testimony seems to indicate that my clients are right, that this is what's been happening for decades, and that they've been farming this three and a half acres. I understand when somebody finds out after they get a survey, gee whiz, somebody has been farming ground that's legally described as mine, and I have it in a deed of mine for many, many years, almost three and a half acres. I don't want to stop that from happening anymore. But these types of situations is why the doctrine of adverse possession was created in the first place. My clients have been farming this for so many years now, they've been treating it as their own. Nobody stopped them from doing it, including the predecessors in interest to the Carter family. And they only stopped it and took any action to prevent and prohibit my clients and their tenant farmers from farming the property after the survey was conducted by their own guy in roughly 2015. Before that, they never took any action to stop that from happening. My clients made all of the crop income from that nearly three and a half acres, and they never farmed it. So this is truly a situation in which the survey that they had caused them to realize what would have been happening, and they decided that they wanted to try to stop it at that point. I cited the Joyner case in my brief, and we are required to establish with reasonable certainty the location of the boundaries, and that must be susceptible of specific indefinite location. And we can do that according to that case by supporting a survey with testimony and documentary evidence. I submit that that's exactly what we've done in this case. We have the testimony of two witnesses who have farmed it together for 70 plus years. We have documentary evidence in the aerial photographs from GIS, from the USDA, that are kept by those governmental agencies, and we have the survey that specifically provides a legal description for these areas that are in dispute. Whenever you take that all together, I believe that we have met our burden of proof, and even when viewing the evidence in the light most favorable to the partners, that we have, by clearly convincing evidence, established adverse possession over the disputed land and a prescriptive easement over the disputed access. And just to summarize, although they have attempted to create some issues of fact, I don't believe there are any genuine issues of material fact when considering all of the evidence that's been submitted by both parties to the trial court and now before this court, and for those reasons, we believe the trial court got it right and the trial court's decision on summary judgment should be affirmed. If there are any more questions, I'd be happy to answer them. But if not, I will rest. Thank you, counsel. Rebuttal. Your Honor, I believe that the deposition testimonies, the affidavits, and the pleadings in this case will show and do show that there are material issues of genuine fact here to defeat the grant of summary judgment. The summary judgment is not to decide if they look to determine the fact, but just to see if one exists or if facts exist. And we believe that when the record is examined, that shows that there are facts that are appropriate for trial. Credibility is a huge one, as has been pointed out. Just the deposition testimonies alone of Mr. Widener and then the portions of Mr. Kett's transcript show credibility issues, recollection issues. So we believe that clearly material facts exist. Thank you. Thank you. We appreciate your arguments. We will take this matter under advisement with your decision in due course.